# EXHIBIT A

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| THE WOODS APARTMENTS, LLC, MICHAEL BLANKENBAKER, and PROFESSIONAL PROPERTY MANAGERS, LLC,<br><br>      Plaintiffs,<br><br>v.<br><br>UNITED STATES FIRE INSURANCE CO., and CRUM & FORSTER, a Fairfax Company<br><br>      Defendants. | Court No.: 3:11-cv-00041-JBC |

### AFFIDAVIT OF LOREY M. CALDWELL

I, Lorey M. Caldwell, being duly sworn, do hereby depose and state as follows:

  1.  I am and adult over the age of eighteen, understand the meaning and obligation of an oath and am competent to testify to the matters set forth in this affidavit if called upon to do so.

  2.  I am the Vice President of Engineering for Rudick Forensic Engineering, Inc., and have been appointed by United States Fire Insurance Company ("U.S. Fire") to act as an impartial appraiser with respect to a claim for damage to siding and roofs caused by Hurricane Ike at The Woods apartment complex in Jeffersonville, Indiana.

  3.  Upon being appointed as the appraiser for U.S. Fire, I was advised that Richard Moore of R.W. Moore Consulting Engineers, P.S.C., had been appointed as the appraiser for Plaintiffs.

  4.  I received CD-Rom disks containing documents from the attorneys for Plaintiffs and U.S. Fire. I asked Mr. Moore to obtain some additional information regarding the age of the

roofs and siding on each of the buildings that are a part of The Woods apartment complex. Mr. Moore and I also discussed the Court's scheduling order and our obligation to conduct a joint inspection of the property.

5. On September 4, 2012, Mr. Moore and I spoke about the site inspection and confirmed the inspection would proceed September 11 through September 13, 2012 and Friday, September 14, 2012, if necessary. Mr. Moore advised he would locate a local roofer that could provide us with continuous ladder use so that we could access the roofs. We discussed the possibility of using Brian Wood, an employee of various roofing companies who prepared a number of the estimates that had previously been provided to Mr. Moore and me. I indicated that while I would not want Mr. Wood to provide any commentary about his estimates or thoughts about the condition of or damage to the roofs, I thought he might be able to provide some background information about the age and repairs made to the roofs.

6. On September 4, 2012, Mr. Moore and I also discussed the court's order that we each provide our repair estimates within two weeks of the inspections. We agreed that would not be sufficient time to prepare such estimates and agreed to ask the attorneys for Plaintiffs and Defendant to request an extension of that deadline from the court. We also discussed the fact that if we were unable to come to an agreement regarding the Hurricane Ike damage to the property, we would have to discuss the appointment of an umpire.

7. On September 6, 2012, Mr. Moore forwarded me an e-mail he had received from Eric Lamb, attorney for the Plaintiffs. A true and correct copy of that e-mail is attached hereto as Exhibit A. That afternoon I called Richard Moore regarding the e-mail. While Mr. Moore told me he agreed that he and I should be conducting a joint inspection at the site, he also said he had not received a green light for the inspection. We agreed to keep the site inspection dates as

previously scheduled. He told me he wanted to see if the attorneys could work this out. I sent the e-mail I received from Richard Moore on to Michael Foran, the attorney representing U.S. Fire, so he could contact Mr. Lamb and resolve the issues apparently being raised by Mr. Lamb regarding the cost and conduct of the joint inspection of the property by the appraisers.

8. On Sunday, September 9, 2012, I called Mr. Moore, and left a voice mail message asking him to confirm that the appraisal would proceed as we had previously agreed. He responded with an e-mail, advising that "everything is a go from this end".

9. On Monday, September 10, 2012, at 7:38 a.m., I received an e-mail from Richard Moore in which Mr. Moore stated that since he sent his e-mail to me the previous afternoon, he had received some e-mails which raised some questions about going forward with the joint inspection we had scheduled to begin the following day, September 11, 2012. I called Mr. Moore and he told me he would try and resolve the issues raised by the e-mails and call me back. I told Mr. Moore I wanted to get on the road toward The Woods by 1:00 p.m. on the 10th. At about Noon, I received a call from Richard Moore who told me that the joint inspection was on, but that conditions had been imposed on that joint inspection. Specifically, Mr. Moore told me he was instructed that he could not discuss the scope of the storm damage with me, or make any agreements with me regarding the damage to the property; rather, he had been instructed only to gather information to be negotiated at a later date. I called Michael Foran, the attorney for U.S. Fire, to advise him of my conversation with Richard Moore and asked him to raise this matter with Plaintiffs' attorney.

10. On September 11, 2012, when I arrived at The Woods to conduct the joint inspection with Mr. Moore, Brian Wood was present with a ladder so Mr. Moore and I could

-3-

access the roofs. Also present were Mike Mayor, a building consultant apparently hired by Plaintiffs and Plaintiffs' public adjuster Richard Michelson.

11.     Mr. Moore and I agreed to begin our inspection by inspecting the siding on each of the buildings in The Woods apartment complex. When Mr. Moore and I started the inspection, Mr. Mayor and Mr. Michelson attempted to accompany us. I told them that since they were not involved in the appraisal they should not accompany Mr. Moore and I as we inspected the property. They departed, but returned and again attempted to accompany Mr. Moore and I as we inspected the property. I again told Mayor and Michelson that they were not part of the appraisal and could not accompany Moore and I on the inspection. At this point, they stayed on site, but went to other portions of the complex and allowed Mr. Moore and I to complete our joint inspection of the siding of the buildings. During our inspection, I attempted to discuss my observations about the siding with Mr. Moore. Mr. Moore was non-committal and would not engage in substantive discussions about whether or not the siding has sustained storm damage.

12.     On September 12, 2012, Mr. Wood was not present at The Woods apartment complex. Instead, Mr. Mayor was present with a ladder. Mr. Michelson was also present. When Mayor and Michelson again tried to accompany Mr. Moore and I on our joint inspection, I told them that as they were not involved in the appraisal, they could not accompany Moore and I on our joint inspection. Mr. Michelson told me this was Plaintiffs' property and they had a right to be on the property. I told Michelson that such was fine, but he and Mayor could not accompany us on or interfere with the joint inspection with Mr. Moore. At that time I contacted Michael Foran and asked that he contact the Plaintiffs' attorney to attempt to resolve the dispute.

13. During this time, Mr. Mayor and Mr. Moore went to go on to one of the roofs. Mr. Moore told me he was going to make the roof inspection because that is what they were paying him for. Mayor and Moore then climbed atop one of the roofs at The Woods. I remained on the ground. From my vantage point, I saw Mr. Mayor leading Mr. Moore around the roof and pointing out portions of the roof to Mr. Moore.

14. I received a call back from Mr. Foran. Mr. Foran told me he spoke with Plaintiffs' attorney and that Plaintiffs attorney said he had not instructed Mayor or Michelson to accompany Mr. Moore and I on our joint inspection of the property. I then spoke with Mr. Moore and Mr. Mayor while on one of the roofs and advised them what I had been told by Mr. Foran. Mr. Mayor told me he was not interfering with the joint inspection, but only providing the ladder, although he was on the roof, accompanying Mr. Moore. Moore and Mayor then climbed on to another roof and Mayor again began leading Moore around the roof, pointing things out and telling him "just like the last one".

15. I then again spoke with Mr. Foran. He informed me he was told that Plaintiffs' attorney had sent an e-mail to Mr. Michelson directing Michelson and Mayor not to accompany Moore and I on the joint inspection. I then approached Moore and Mayor again when they were coming off of a roof and asked if they had received the e-mail discussed by Mr. Foran.

16. Mr. Moore said he had not received any e-mail or further direction from Plaintiffs' attorney. I also told Moore and Mayor that the e-mail had gone to Mr. Michelson. Mr. Mayor told me Michelson had left the property.

17. I located Richard Michelson who had just returned to the site and was in his car on a cell phone. After Mr. Michelson got off the phone, I spoke with him about what Mr. Foran

told me about a clarification e-mail from Plaintiffs' attorney. Mr. Michelson told me he had not received such an e-mail and that I would have to talk with U.S. Fire's attorney.

        18.    I called Mr. Foran who asked me to go to William Wetterer's office so that we could prepare an affidavit documenting what had happened.

_____
Lorey M. Caldwell



Subscribed and sworn to before me on this 13th day of September, 2012

Notary Public
My Commission Expires

MELISSA L. BLOOMBERG, Notary Public
STATE OF OHIO
My Commission Expires October 23, 2015